IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

UNITED STATES OF AMERICA

v.  CASE NO. 1:13-CR-12-WLS

STEWART PARNELL, ET AL.

**DEFENDANT STEWART PARNELL'S *DAUBERT* BRIEF**

COMES NOW Defendant Stewart Parnell, by counsel, and submits this brief pursuant to this Court's order of March 17, 2014 (ECF No. 138). Parnell seeks to admit the expert opinions and testimony of Dr. Joseph Conley, Jr., in accordance with Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

**I.   Statement of the Case**

On September 16, 2013, Parnell designated Dr. Joseph C. Conley, Jr., PhD as an expert neuropsychologist who performed a neuropsychological evaluation of Parnell (ECF No. 107). On October 25, 2013, the government filed its Motion for Daubert Hearing claiming that the testimony of Dr. Conley should not be admitted because "Dr. Conley's testimony would not 'help the trier of fact to understand the evidence or to determine a fact in issue'" (ECF No. 110).

Parnell filed his Response to Government's Motion for Daubert Hearing on November 15, 2013 (ECF No. 114) and attached Dr. Conley's Preliminary Report, explaining that the evidence offered by Dr. Conley would help the jury understand the evidence or would assist the jury in determining a fact in issue (e.g., whether Stewart Parnell read, appreciated, or connected the information contained in emails or chains of emails over a several-year period and participated in a concerted scheme).

1

Next, the government filed its Reply on November 29, 2013, arguing that "[t]he issue currently before this Court is not the admissibility of such evidence, but rather the means by which this Court should exercise its gate-keeping function in determining the admissibility of Dr. Conley's testimony" (ECF No. 117). In its Reply, the government shifted its focus from the question of whether the testimony of Dr. Conley would assist the trier of fact in determining whether the methods he utilized are sufficiently reliable.

Only days after submitting its Reply challenging Dr. Conley's methodology, the government filed a Motion for Competency Hearing, reiterating that "Dr. Conley's conclusion is speculative with no basis in fact," yet justified its motion by stating that "Dr. Conley's report, considered as a whole, does bring into issue Mr. Parnell's mental competency, particularly with respect to his ability to properly assist his attorneys in his defense" (ECF Doc. 118).

Parnell submitted the Supplemental Report of Dr. Conley on March 10, 2014 (ECF No. 135), as well as Dr. Conley's underlying data to the government's hired expert, Dr. Schretlen. The government noticed Dr. Schretlen as an expert witness on March 11, 2014, and attached his report dated March 10, 2014 (ECF No. 136). The Court heard nearly seven hours of evidence on this issue on March 13, 2014.

II.     **Argument**

   a. *Legal Standard*

Federal Rule of Evidence 702 specifically sets the standard for the admissibility of expert opinions:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is

>   the product of reliable principles and methods; and (d) the expert
>   has reliably applied the principles and methods to the facts of the
>   case.

Fed. R. Evid. 702.  The Supreme Court's decision in *Daubert* held that the Court's role is to act as a gatekeeper to the admission of scientific evidence and must engage in a three-party inquiry. Daubert, 509 U.S. 579 (1993); see also Eastep v. Newman, 2013 U.S. Dist. LEXIS 178986, at *2 (M.D. Ga. Dec. 20, 2013).  This three-part inquiry requires that:

>   (1) the expert is qualified to testify competently regarding the matters he intends to address;
>
>   (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and
>
>   (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004).

It is worth noting that the District Court has wide discretion in exercising its gatekeeping function and that "although rulings on admissibility under *Daubert* inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology, it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." Eastep, 2013 U.S. Dist. LEXIS 178986, at *5 (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (internal citations omitted)).

Stated another way, "[e]xpert testimony must amount to more than 'guess or speculation,' but 'where the expert testimony has a reasonable factual basis, a court should not exclude it. Rather, it is for opposing counsel to inquire into the expert's factual basis." Eastep, 2013 U.S. Dist. LEXIS 178986, at *5-6 (citing *United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1040 (11th Cir. 1988).

*b. Analysis*

**1. Dr. Conley's Qualifications Remain Unchallenged and Satisfy *Daubert***

First, this Court must address whether Dr. Conley is qualified to testify competently regarding the matters he intends to address. It is worth noting that the government has previously stated that it has "yet to determine if it will challenge [Dr. Conley's] qualifications as an expert." (ECF No. 117, at p. 3). At the recent evidentiary hearing, the government did not challenge, or indeed even question Dr. Conley about his qualifications as a clinical psychologist specializing in neuropsychology during the several hours of cross-examination. Though the government has not overtly stated that it challenges Dr. Conley's qualifications, the lack of cross-examination or questioning on this issue at the hearing and in prior briefing undermines any serious challenge that the government may mount as to Dr. Conley's qualifications as an expert in this case.

Nevertheless, Dr. Conley's unchallenged testimony established that he is a clinical psychologist specializing in neuropsychology and holds a "bachelor's degree in what today would be criminal justice, a master's degree social worker [*sic*], a master's degree in psychology, and a Ph.D. in psychology, and a postdoctoral fellowship in neuropsychology." (Tr. p.12, ll 10-13). Dr. Conley is licensed as a clinical psychologist in the Commonwealth of Virginia and focuses his practice nearly exclusively on evaluating whether patients suffer from ADHD, conducting approximately 300 ADHD evaluations every year. Dr. Conley testified that he has diagnosed "[p]erhaps 8 to 10,000" patients in his career.[1] (Tr. p.14, ll 1-5). There can be no question that Dr. Conley possesses the requisite education, licensing, and clinical experience

---

[1] Dr. Schretlen testified that he "[o]ccasionally" sees patients to make a determination as to whether or not they may suffer from ADHD. (Tr. p.123, ll 16-20).

necessary to establish that he is qualified to testify competently regarding the matters he intends to address, as required by *Daubert*.

### 2. Dr. Conley's Methodology Is Reliable

This Court must satisfy itself that the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*. There are a number of factors to consider in this regard, including: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publications; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. See McCorvey v. Boxer Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002) (citing *Daubert*, 509 U.S. at 593-94). Notably, "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." Frazier, 387 F.3d 1244 at 1262.

There can be no serious question as to whether Dr. Conley's methods for diagnosing ADHD have been tested and are generally accepted by the medical and neuropsychological community. Dr. Conley testified that "[p]ediatricians and psychiatrists diagnose [ADHD] every day on the basis of history and symptoms" and conduct no further testing. Dr. Conley confirmed that there are no specific tests that are required to be conducted in order to diagnose someone with ADHD; instead, patient history and symptomatology are the current standards. (Tr. p. 18, ll 14-18). Though ADHD is diagnosed daily by pediatricians and psychologists across the United States based solely on history and symptomatology, Dr. Conley testified that he performed numerous additional tests to aid in the diagnostic process. These tests included:

- the Reynolds Intellectual Assessment Scales,

5

- Digital Span,

- Comprehensive Trial (sic) Making Test,

- Continuous Performance Test,

- Boston Naming Test,

- Wisconsin Card Sorting Test,

- Tower of London Test,

- Minnesota Multiphasic Personality Inventory,

- Structured Inventory of Malingered Symptomatology, and

- Validity Indicator Profile.

Dr. Conley also interview Parnell's wife and two daughters, and subsequently his elderly mother.

On cross-examination by the government, Dr. Conley reiterated that he utilized the generally accepted standards in his field of expertise: "You get symptoms report, you get behavioral observations, and then you, for example, have test data. … That's the way I do it and that's the way my peers do it." (Tr. p.68, ll 15-22). Dr. Conley also explained to the Court that the tests he administered constitute "the most objective, unbiased data available" and these tests are "in fact, perhaps the only unbiased and objective data available." (Tr. p.74, ll 24-25 to p. 75, ll 1-4).

The government's own witness, Dr. Schretlen confirmed that Dr. Conley's approach to diagnosis was correct. In fact, Dr. Schretlen testified on direct examination that "the tests that [Dr. Conley] gave were pretty reasonable." (Tr. p. 132, ll 3-4). Dr. Schretlen also testified that he would interview family members, conduct a battery of tests, and then review other records that might be available (including school records if accessible) in order to diagnose an individual with ADHD. (Tr. p.177, ll 5-20). Specifically, Dr. Schretlen stated that "based on my

6

observations and my interview findings and the history as I received it, I then administer a battery of tests much like Dr. Conley did, and I will then review the results of those tests and put them in the context of the history." (Tr. p. 130, ll 12-16).

The government, on the other hand, repeatedly sought to elicit testimony from Dr. Schretlen (and Dr. Conley as well), that the DSM-5 manual provides the diagnostic criteria that must be evaluated in order to diagnose any person with ADHD.  Dr. Schretlen ultimately conceded that despite his best efforts to try and use the DSM-5 as a guide for diagnosing ADHD for purposes of his testimony, he was unable to conclude that the DSM provides the standard for diagnosing ADHD.  In Dr. Schretlen's own words, the DSM is only "a nomenclature and taxonomy of diseases with diagnostic criteria that most clinicians use to guide their interview questions." (Tr. p. 179, ll 1-6).

Though not required by any licensing board, manual, or even standard practice, Dr. Conley administered a battery of tests and conducted numerous interviews to accurately diagnose Parnell's reported cognitive and behavioral issues.  These interviews revealed that Parnell has a history of in excess of 40 years of signs and symptoms of ADHD.  Notably, despite lengthy examination into the underlying data reported by Dr. Conley, neither the government, nor Dr. Schretlen called into question the objectivity or application of any of these ten separate tests.  Indeed, neither the government nor Dr. Schretlen identified any errors in test administration or application.

Instead, Dr. Schretlen opined that Dr. Conley did not do enough to accurately diagnose Parnell with ADHD, despite agreeing that Dr. Conley gave "reasonable" tests and that interviewing family members, conducting a battery of tests, and reviewing records that might be available is standard practice in diagnosing ADHD as a neuropsychologist.  According to Dr.

Schretlen, to accurately diagnose ADHD for Parnell, a neuropsychologist would need to test the patient for a multitude of other possible issues such as diabetes, hypothyroidism, Vitamin B deficiencies, hypertension, cerebrovascular issues, elevated cholesterol, etc. (Tr. p. 181, ll 7-20; Tr. pp. 149-150). Dr. Schretlen testified that he would also have ordered an MRI, would have reviewed emails, and would have interviewed "people who have worked with him day in and day out for years" including "business associates, former teachers, [and] professors." (Tr. p. 157, ll 14-25 to p.158, ll 1-9). Dr. Schretlen also conceded that there is no requirement that a clinician have school records to diagnose ADHD, but maintains that evidence of symptomatology that is described in the DSM-5 prior to age 12 is required as a prerequisite to an ADHD diagnosis, even though Dr. Schretlen described the DSM as a "nomenclature and taxonomy of diseases … that most clinicians use to guide their interview questions." (Tr. p. 182, ll 10-24; Tr. p. 179, ll 1-6).

What is apparent from Dr. Schretlen's testimony is that he does not agree with the conclusions that Dr. Conley arrived at from conducting interviews, administering a battery of tests, and observing Parnell. And despite Dr. Schretlen's repeated attempts to categorize his evaluation of Dr. Conley's conclusions as problems with Dr. Conley's methodology, neither the government nor its hired expert can claim that Dr. Conley employed a methodology that is anything other than more thorough and complete than what is generally accepted in the field of neuropsychology and among pediatricians and psychologists. Instead, Dr. Schretlen conflates methodology and generally accepted standards with conclusions that he seeks to undermine during the trial process (e.g., in the context of litigation).

In his own words, Dr. Schretlen revealed the core of the issue he takes with Dr. Conley's opinions: "in the context of litigation, I would definitely try and obtain informants. If I were in Dr. Conley's shoes, if I had been retained by defense, I would have tried – I would have asked

8

you to try and get me permission to talk with coworkers or employees." (Tr. p. 192, ll 2-7). Dr. Schretlen testified that "[y]ou know, it seems like, in a forensic setting, it would be the attorney who would be trying to track down – run to ground some of those leads [including] … childhood history … some school or medical records." (Tr. p. 149, ll 9-16). Thus, by Dr. Schretlen's own admissions, this extra battery of tests Dr. Schretlen would order to ascertain "competing explanations" for Parnell's neuropsychological test results might help bolster credibility in the context of litigation, but are not required for a methodologically-sound diagnosis. Put another way, Dr. Schretlen's requirement that Parnell be tested for a plethora of other potential medical issues is not required to properly diagnose ADHD. Rather, Dr. Schretlen's opinion that additional testing be done goes to the weight and credibility of Dr. Conley's testimony, which is an issue for the trier of fact.[2] The government's attempts to confuse the reliable methodology standard outlined in *Daubert* and ultimate conclusions is without merit.

Even stepping back from Dr. Schretlen's attempts to confuse methodology and conclusions, it is apparent that what Dr. Schretlen advocates runs afoul of common sense and generally accepted standards in the medical community regarding patient confidentiality. If Dr. Schretlen's opinions on interviewing co-workers, professors, business colleagues, friends, and others about a patient's cognitive and behavioral history were given credence, there would be a profound chilling effect on seeking medical advice for any cognitive or behavioral abnormalities and perhaps even for other medical issues such as diabetes. Based on Dr. Schretlen's methodology, it would be generally accepted practice for an internist to interview a potential

---

[2] Recall that "although rulings on admissibility under *Daubert* inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology, ***it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence***." Eastep, 2013 U.S. Dist. LEXIS 178986, at *5 (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (internal citations omitted) (emphasis added)).

diabetic patient's colleagues to determine if the patient was sneaking Twinkies in his brown bag lunch.

By way of another example, based on his testimony, Dr. Schretlen would require a doctor trying to diagnose an ailment such as a simple cold to conduct blood work, a liver biopsy, a colonoscopy, a bone marrow test, and perhaps even an open heart surgery to be absolutely certain that the cold was not caused by some other alternative explanation. This approach/methodology is patently absurd, is unsupported by the general standards applicable in Dr. Conley's field, and even in the context of litigation or forensic examination (as Dr. Schretlen has framed the issue), such a methodology makes no sense. Indeed, if one accepts Dr. Schretlen's testimony about a reliable methodology regarding ADHD diagnosis, every pediatrician and psychologist in the United States that diagnoses ADHD based on history and symptomology has run afoul of diagnostic standards and has not given a reliable diagnosis.

In short, Dr. Schretlen's testimony about a proper methodology in the context of a "forensic" or "litigation" setting are unconvincing, impractical, and misstate the actual standard required for admitting evidence under *Daubert*. Dr. Schretlen confirmed that Dr. Conley's methodology of interviewing family, obtaining a history, conducting a battery of tests, and interviewing the patient is the generally accepted standard of practice for diagnosing ADHD as a neuropsychologist. Indeed, Dr. Conley could have diagnosed Parnell with ADHD based solely on history and symptoms and satisfied the standard of reliability required by *Daubert*.

### 3. Dr. Conley's Testimony Assists the Trier of Fact to Understand the Evidence and to Determine Facts in Issue

Notably, at the recent *Daubert* hearing, little mention was made of whether Dr. Conley's expert opinions would assist the jury in understanding the evidence and to determine facts in issue. In its motion triggering the *Daubert* hearing, the government argued that "Dr. Conley's

10

testimony would not 'help the trier of fact to understand the evidence or to determine a fact in issue'" because it was "psychological evidence" that was inadmissible.  (ECF No. 110). Specifically, the government incorrectly framed the issue in terms of general statements about psychiatric evidence, mitigation of alleged conduct, or an inability to form a specific intent to commit a particular crime.  As Parnell pointed out in his Response, Dr. Conley's testimony will be offered to show that Stewart Parnell did not commit the crimes alleged because he never factually acquired the knowledge necessary to form any intent about the actions alleged by the government. (ECF No. 114).

The government, both in its initial motion, and in its subsequent Reply, ignores the fact that the Eleventh Circuit has adopted a rule stating that psychiatric evidence that offers to establish facts indicating that the defendant did not commit the crime is proper and admissible.[3] This rule is precisely the situation before this Court:  Dr. Conley's testimony offers information to establish facts indicating that Parnell did not commit the crimes the government alleges (because he lacked knowledge), and does not seek to introduce opinions into evidence indicating that Parnell could not help himself from committing the criminal acts alleged.

Dr. Conley's testimony will not confuse a jury and forms part of the factual context that the jury is empanelled to determine.  There is no risk that the jury will be distracted from focusing on the actual presence or absence of *mens rea* because the testimony offered by Dr. Conley does not even deal with Parnell's *mens rea*.  Rather, this testimony refutes the government's position that Parnell read and understood the emails and managed to orchestrate and implement a complicated scheme.  Likewise, there is no risk that the jury will be so confused by the testimony that it will be able to conclude that Parnell was somehow justified in

---

[3] *See* United States v. Cameron, 907 F.2d 1051 (11th Cir. 1990)  (adopting the standard set forth in *United States v. Staggs*, 553 F.2d 1073 (7th Cir. 1977)).

committing the crimes alleged. Instead, the jury will be presented with two factual contexts and be charged with determining which set of facts is correct or incorrect. Parnell denies committing any of the crimes alleged by the government and hence there is no need for any reliance on justifying his actions.

It bears emphasis that neither in its Reply or at the *Daubert* hearing did the government contest, challenge, or even question the purpose for which Parnell seeks to introduce the testimony of Dr. Conley. It is clear from Dr. Schretlen's testimony that he fundamentally misunderstands what the evidence will be offered for: "my understanding of the Daubert issue is whether or not his expert knowledge of neuropsychology could help the trier of fact understand evidence pertaining to his acquisition of the knowledge required to form the intent to commit the crime – the alleged crime. So the question as I read it, as I understood it, is, is expert knowledge in neuropsychology will that be helpful in assisting the trier of fact to understand this kind of evidence." (Tr. p. 158, ll 14-22). In reply to the government's question about whether Dr. Schretlen could offer any opinion as to whether Dr. Conley's testimony could assist the jury, Dr. Schretlen replied that "I think that we cannot exclude the possibility, Your Honor, that this is a normal neuropsychological examination." (Tr. p. 159, ll 15-17). Once again, Dr. Schretlen's testimony goes to the issue of credibility and weight of evidence, not whether or not the information would assist the jury in understanding the evidence or determining a fact in issue. Dr. Schretlen's opinion also fundamentally misunderstands that Parnell's purpose in offering Dr. Conley's opinion is not to negate specific intent, but is instead offered to establish facts that are in dispute.

The law in the Eleventh Circuit on the third prong of *Daubert* holds that expert evidence assists the jury "if it concerns matters that are beyond the understanding of the average lay

14871/6/6613086v1

person." Frazier, 387 F.3d at 1264 (citing *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985)) (expert testimony admissible if it offers something "beyond the understanding and experience of the average citizen").  The effect that a diagnosis of "a variant of developmental, residual fronto-dysexecutive disorder (i.e., ADHD as it is currently identified) … involv[ing] inadequate arousal of the frontal lobes with particular inactivity in areas participating in the inhibition and the intentional direction, control, planning, organization, and integration of mental and behavioral impulses, according to situational demands or changes" is certainly beyond the understanding and experience of the average citizen.  Dr. Conley's explanation of the impact of ADHD and Parnell's cognitive dysfunction will aid the jury in understanding the evidence before it and will assist the jury in determining facts in issue, *inter alia*, whether Parnell ever obtained the knowledge necessary to be aware of (let alone mastermind) a complex, multi-party long-standing scheme as the government alleges.

In summary, the evidence offered by Dr. Conley at the *Daubert* hearing and in his reports illustrates that (1) he is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which Dr. Conley reaches his conclusions is sufficiently reliable, and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.  To the contrary, Dr. Schretlen's lengthy testimony (1) did not challenge that Dr. Conley is qualified to testify on matters of neuropsychology, (2) critiqued the conclusions of Dr. Conley and disguised these critiques as questioning Dr. Conley's methodology, and (3) did not even address or challenge the manner in which Dr. Conley's testimony will be used to develop facts surrounding Parnell and the knowledge he possessed in relation to the alleged crimes.

As detailed above, this Court's role is to act as a gatekeeper and not to make any determinations or even address the weight or credibility of the evidence. Throughout the pre-hearing briefing and in the *Daubert* hearing, the government and its expert repeatedly conflated the standards for *Daubert* analysis (e.g., methodology, reliability, and assisting the trier of fact) with examining the weight of the evidence. The standard, however, could not be clearer: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [] admissible evidence." Daubert, 509 U.S. at 595. The jury, then, will be the ultimate judge of whether Dr. Conley's testimony is credible.

WHEREFORE, Defendant Stewart Parnell respectfully requests this Court admit the testimony that Dr. Conley intends to provide to the jury in the trial of this matter.


By: s/ E. Scott Austin
Of Counsel


E. Scott Austin, Esq.
Gentry Locke Rakes & Moore LLP
10 Franklin Road SE
Post Office Box 40013
Roanoke, Virginia  24022
Tele:  (540) 983-9393
Fax:   (540) 983-9400
saustin@gentrylocke.com
Virginia State Bar #41260

Counsel for Defendant

## **CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing to be presented to the Clerk of the Court for filing and uploading to the CM/ECF system, which will send notification of such filing to all counsel of record, on this 27th day of March, 2014.

s/ E. Scott Austin